**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; JOSEPH SHER, in his official capacity as Acting Director of the ICE Boston Field Office; U.S. DEPARTMENT OF HOMELAND SECURITY; and MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,<br><br>*Defendants*. | No. 1:26-15219 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The Commonwealth of Massachusetts ("Plaintiff") alleges as follows:

**INTRODUCTION**

1. The Commonwealth of Massachusetts has the sovereign right to both manage its judicial system and determine whether and how to deploy state resources. Massachusetts has exercised that right to protect fundamental safeguards for the state court system by codifying its interests and protections in Chapter 221D of the Massachusetts General Laws—the PROTECT Act. Among other restrictions, the PROTECT Act bans civil arrests in courthouses without a judicial warrant. The Defendants have continuously infringed on the Commonwealth's sovereign rights by completely disregarding these restrictions when they enforce federal immigration law in Massachusetts.

2. The Massachusetts court system serves the Commonwealth's more than seven million residents and operates in approximately one hundred court buildings throughout the state. A wide range of people participate in the judicial process in those courthouses—witnesses, jurors, plaintiffs, petitioners, defendants, family members, attorneys, members of the press, and court staff. Public access to and safety in these courthouses are essential to the orderly administration of justice, which lies at the heart of the sovereign authority retained by the States.

3. Unencumbered courthouse access is essential to the basic functioning of the state court system. It enables transparency for the public, the fact-finding function of the judiciary, resolution of civil and criminal disputes based on party participation and representation, public faith in the judicial system, and upholding fundamental constitutional protections, including the right to petition the Government for redress of grievances, the right to due process, and the rights of criminal defendants to a speedy and public trial and to be confronted with the witnesses against them.

4. To the detriment of these judicial processes, and by commandeering Massachusetts resources, Defendants are violating Massachusetts law nearly every single day by conducting civil arrests in Massachusetts state courthouses. They currently do so pursuant to a directive issued in May 2025, despite that directive having been vacated by a federal district court in June 2026. A copy of the directive, issued on or about May 27, 2025, as Policy Number 11072.4, "Civil Immigration Enforcement Actions In or Near Courthouses" ("May 2025 Directive"), is attached as Exhibit A and incorporated herein.

5. The enforcement of this policy to pursue immigration arrests in state courthouses has been continuous after the vacatur of the May 2025 Directive and after the passage of the PROTECT Act. It has disrupted ongoing civil and criminal proceedings; deterred individuals

from coming to and participating in state court proceedings; damaged state court property; affected the ability of prosecutors, defense attorneys and victim advocates to do their jobs; and ultimately impaired the administration of justice in Massachusetts.

6. These aggressive actions in Massachusetts state courthouses are no accident. Defendants are intentionally disregarding state law and the sovereign interests of Massachusetts in regulating what happens inside its courthouses.

7. Defendants are also intentionally using Massachusetts state resources to facilitate ICE's immigration agenda. They are commandeering state personnel and resources by using the infrastructure of state government to enforce federal immigration law. Specifically, they are relying on state-generated information, state infrastructure, state law enforcement, and state security systems to identify, locate, disarm, and contain federal targets.

8. Defendants' May 2025 Directive to conduct civil immigration arrests in state courthouses is unlawful in multiple ways.

9. First, the directive violates the Administrative Procedure Act ("APA") because it constitutes arbitrary and capricious agency action. The directive was issued without reasoned decision-making and without regard for the impact of the directive on the States where the arrests take place, while relying on inappropriate considerations and simultaneously failing to consider important aspects of the problems related to and caused by the directive.

10. Second, the directive violates the APA because Defendants have acted in excess of their statutory authority. The federal statute that authorizes civil immigration arrests, the Immigration and Nationality Act ("INA"), does not expressly permit civil arrests in courthouses, and must be construed to prohibit such arrests when the arrests interfere with historic powers of

the States. Those historic powers include the States' authority to restrict arrests in state courthouses—as Massachusetts has done.

11. Third, the directive violates the APA and the Constitution itself because it is contrary to the Constitution's protections of state sovereignty, enshrined in the Tenth Amendment. Defendants' actions violate the Tenth Amendment because they run afoul of the core constitutional protection of the Commonwealth's sovereign rights—here, both to manage its judicial system and to determine whether and how to deploy state resources without being commandeered by Defendants.

12. Massachusetts seeks vindication of its sovereign interests, vacatur of the Defendants' unlawful directive to conduct civil immigration arrests at state courthouses in violation of local laws, and an injunction of the directive and its implementation.

## JURISDICTION AND VENUE

13. This court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the United States Constitution and the APA. 5 U.S.C. §§ 701–706.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are the United States and its agencies and officers sued in their official capacities. The Commonwealth of Massachusetts is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within this district.

## PARTIES

15. Plaintiff Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Andrea Joy Campbell, the Commonwealth's chief legal officer.

16. Defendant U.S. Immigration and Customs Enforcement ("ICE") is an agency within the Department of Homeland Security. ICE is responsible for the enforcement of federal immigration law. 8 C.F.R. § 100.1 (delegating authority to ICE "to administer and enforce certain provisions of the Immigration and Nationality Act and all other laws relating to immigration"). ICE agents and officers execute civil arrests in and around the courts of the Commonwealth of Massachusetts pursuant to federal directive, as alleged below.

17. Defendant David Venturella is the Acting Director and the Senior Official Performing the Duties of the Director of ICE. Defendant Venturella is responsible for overseeing the administration of federal immigration enforcement policies. 6 U.S.C. § 252(a)(3). Defendant Venturella has authority over the policies challenged in this litigation. Defendant Venturella is sued in his official capacity.

18. Defendant Joseph Sher is the Acting Director of the Boston Field Office for ICE's Enforcement and Removal Operations ("ERO") directorate. The ERO Boston Field Office is responsible for and oversees ICE operations in Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont. Defendant Sher has authority over the implementation in Massachusetts of the policies challenged in this litigation. Defendant Sher is sued in his official capacity.

19. Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f). DHS is responsible, among other things, for the administration and enforcement of federal immigration laws. The agency's officers carry out enforcement activities under the authority of the agency and pursuant to the directive issued and approved by DHS.

20. Defendant Markwayne Mullin is the Secretary of Homeland Security and head of DHS. 6 U.S.C. § 112(a). The Secretary of Homeland Security is "charged with the administration and enforcement of [the Immigration and Nationality Act] and all other laws relating to the immigration and naturalization of aliens," except where otherwise conferred on other officials. 8 U.S.C. § 1103(a)(1). "All authorities and functions of the Department of Homeland Security to administer and enforce the immigration laws are vested in the Secretary of Homeland Security." 8 C.F.R. § 2.1. Defendant Mullin is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I. The Massachusetts Constitution and State Court System.

21. The Massachusetts Constitution was ratified in 1780 by popular vote. It is divided in two parts: the Massachusetts Declaration of Rights, defining the "inalienable rights" of the residents of Massachusetts; and the Frame of Government, defining the structure of the state government.

22. The Massachusetts Constitution, which became the model for the federal Constitution, divides the government into three branches: Legislative, Executive, and Judicial. Mass. Const. pt. 2, chs. I–III. The Legislative branch is empowered to "erect and constitute judicatories and courts of record, or other courts, to be held in the name of the commonwealth, for the hearing, trying, and determining" of all civil and criminal offenses which occur within the state. Mass. Const. pt. 2, ch. I, art. III. The Legislature is further empowered to "make, ordain, and establish . . . orders, laws, statutes, and ordinances . . . for the good and welfare of th[e] commonwealth, and for the government and ordering thereof." Mass. Const. pt. 2, ch. I, art. IV.

23. Accordingly, the Massachusetts Legislature has enacted general laws defining "crimes, punishments and proceedings in criminal cases," Mass. Gen. L. chs. 263–280; establishing civil causes of actions and procedures, Mass. Gen. L. chs. 223–236; governing

property, estates, and domestic relations, Mass. Gen. L. chs. 183–210; and otherwise providing for the general welfare and "common good," Mass. Const. preamble.

24. The Massachusetts Constitution vests the "judiciary power" of the Commonwealth in the court system, with judicial officers appointed and commissioned. Mass. Const. pt. 2, ch. III, art. I.

25. The Massachusetts court system serves the Commonwealth's more than seven million residents, without limitations based on immigration status. The court system's judiciary includes more than 400 appointed judges and judicial officers, and approximately one hundred court buildings throughout the state. Mass. Gen. L. ch. 211, 211A, 211B, § 1.

26. Witnesses, jurors, plaintiffs, petitioners, defendants, family members, members of the press, court staff, and others participate in the judicial process by appearing in the state courthouses.

27. The Massachusetts court system consists of the Supreme Judicial Court, the Appeals Court, and the Trial Court. Mass. Gen. L. ch. 211, 211A, 211B. Established in 1692, the Supreme Judicial Court is the oldest appellate court in the United States and operates under the oldest, still functioning written constitution in the world, which includes the Massachusetts Declaration of Rights.[1] The Massachusetts Declaration of Rights guarantees due process rights to all individuals within the Commonwealth. Mass. Const. pt. 1, art. X.

28. The Trial Court has seven departments: District Court, Boston Municipal Court, Housing Court, Juvenile Court, Land Court, Probate & Family Court, and Superior Court. Mass.

---

[1] *About the Supreme Judicial Court*, https://www.mass.gov/info-details/about-the-supreme-judicial-court (last visited Nov. 20, 2026).

Gen. L. ch. 211B, § 1. In the state's 2026 fiscal year (July 1, 2025, to June 30, 2026), more than 847,000 cases were filed in the Trial Court departments.[2]

29. The District Court, within the Trial Court, is located in 62 courts across the Commonwealth. The District Court hears a wide range of criminal, civil, housing, mental health, and other types of cases. Its criminal jurisdiction extends to all violations of municipal offenses, misdemeanors, felonies punishable by a sentence of up to five years in state prison, and certain other felonies such as assault and battery with a dangerous weapon. In civil matters, the District Court hears cases in which the damages are not likely to be more than $50,000, and small claims cases up to $7,000.

30. The Superior Court is a trial court of general jurisdiction for Massachusetts. The court's 82 justices sit in 20 courthouses in all 14 state counties. The Superior Court has exclusive original jurisdiction of first-degree murder cases, and has original jurisdiction of all other crimes, civil actions over $50,000, matters where parties are seeking equitable relief, and actions including labor disputes where parties are seeking injunctive relief. The Superior Court also may hold naturalization sittings in any city or town.

31. The Juvenile Court has 42 judges, in more than 40 locations, and has 11 divisions. The Juvenile Court oversees civil and criminal matters statewide involving children, including youth offender cases, care and protection petitions, delinquency cases, and "child requiring assistance" cases in which parents, guardians, or school officials ask the court to help supervise a child.

---

[2] Mass. Trial Court, Dep't of Research & Planning, FY2026 Year-End Case Filings, https://public.tableau.com/app/profile/drap4687/viz/MassachusettsTrialCourtFY2026Year-EndCaseFilings/5yr-FilingsbyDept (last visited Nov. 20, 2026).

32. The Boston Municipal Court serves the City of Boston and the Town of Winthrop, handling both criminal and civil matters. The Boston Municipal Court Department has 30 judges in eight court divisions located in Brighton, Central (downtown), Charlestown, Dorchester, East Boston, Roxbury, South Boston, and West Roxbury.

33. The Housing Court handles matters involving residential housing such as eviction cases, small claims cases, and civil actions involving personal injury, property damage, breach of contract, discrimination, as well as code enforcement actions and appeals of local zoning board decisions that affect residential housing. The Housing Court has 15 judges and they sit in six divisions: Central, Eastern, Metro South, Northeast, Southeast, and Western.

34. The Probate and Family Court has jurisdiction over family-related and probate matters, such as divorce, paternity, child support, custody, parenting time, adoption, ending parental rights, abuse prevention, wills, estates, trusts, guardianships, conservatorships, and name changes. The court has 14 divisions, one for each county in the state.

35. The Land Court has jurisdiction over a wide range of cases involving real estate and land use and oversees the Commonwealth's system for the registration of title to real property.

36. In some municipalities, the various courts are housed within the same physical courthouse.

37. Massachusetts's state court system and its courthouses are essential to the administration of justice and the rule of law. In fulfilling this role, the court system works to provide the individuals and communities it serves with an environment that is safe and accessible.

## II. Federal Authority for Immigration Enforcement.

38. Under the Constitution, Congress exercises "plenary power" over immigration policy. *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) ("The Court without exception has sustained Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.'" (quoting *Boutilier v. INS*, 387 U.S. 118, 123, (1967)); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]hat the formulation of [policies pertaining to the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government."); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 343 (1909) (discussing "the complete and absolute power of Congress" and "the plenary power of Congress" over immigration policy).

39. Under its constitutional authority, Congress enacted the INA, 8 U.S.C. §§ 1101–1537, which "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 353, 359 (1976)).

40. The INA grants immigration enforcement officers the authority to arrest and detain individuals believed to have committed immigration violations. 8 U.S.C. §§ 1226, 1357. Under the Act, immigration enforcement officers are also authorized to detain and arrest "aliens" who have committed certain enumerated criminal offenses. 8 U.S.C. § 1226(c).

41. In 2002, Congress enacted the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002), which reorganized the government and established DHS. Subsequently, ICE was established as the agency primarily responsible for immigration enforcement in the interior of the United States.

42. DHS regulations empower ICE to "administer and enforce certain provisions of the [INA]." 8 C.F.R. § 100.1. This includes certain powers to arrest under 8 U.S.C. §§ 1226 and 1357. *See* 8 C.F.R. § 287.5(c). The authority conferred by the INA is not a general power to arrest. Rather, the Act defines the circumstances in which an immigration officer can make an arrest.

43. ICE may "use administrative warrants to arrest and detain certain noncitizens 'pending a decision on whether the alien is to be removed from the United States.'" *United States v. City of Boston*, 833 F. Supp. 3d 30, 35–36 (D. Mass. 2026) (quoting 8 U.S.C. § 1226(a)). ICE agents may make arrests without administrative warrants only under limited circumstances, such as where the noncitizen appears to the agents to be entering or attempting to enter the United States unlawfully, the agents have "reason to believe" that the noncitizen is in the country unlawfully and may escape detention before the agents can obtain a warrant, or the individual has committed certain federal crimes. 8 U.S.C. § 1357(a). An immigration arrest under either provision is civil in nature.

44. The INA does not require cooperation between states and federal immigration authorities, *see* 8 U.S.C. § 1357(g)(10), and cannot require state cooperation under the Tenth Amendment, *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019).

45. ICE's three primary directorates are Homeland Security Investigations ("HSI"), Enforcement and Removal Operations ("ERO") and the Office of the Principal Legal Advisor ("OPLA"). ERO manages the immigration enforcement process, including arrest and detention of individuals who are subject to removal or who are unlawfully present in the United States.[3] ICE's ERO directorate has field offices throughout the country, including in Boston. The Boston

[3] https://www.ice.gov/ero.

Field Office for ERO has an area of responsibility that encompasses Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont.

## III. Defendants Have Adopted and Implemented a Series of Directives for Using State Courthouses to Facilitate Civil Immigration Arrests.

46. The Defendants have adopted a series of directives for using state courthouses to facilitate civil immigration arrests without a judicial warrant.

### A. 2018 Directive.

47. In January 2018, ICE issued Directive 11072.1 on Civil Immigration Enforcement Inside Courthouses ("2018 Directive"). A copy is attached as Exhibit B and incorporated herein.

48. The 2018 Directive enlarged the categories of noncitizens subject to civil arrest in state courthouses beyond those specified in a prior guidance from 2014.

49. On information and belief, after the issuance of the 2018 Directive, civil arrests in state courthouses dramatically increased, impeding the judicial process in those state judicial systems.

50. In 2019, several plaintiffs in Massachusetts—two Massachusetts District Attorneys; the Committee for Public Counsel Services ("CPCS"), which coordinates the delivery of criminal and certain noncriminal legal services, under Mass. Gen. L. ch. 211D; and a non-profit organization—filed suit seeking to vacate the 2018 Directive and related declaratory and injunctive relief. *Ryan v. U.S. Immigr. & Customs Enf't*, No. 1:19-cv-11003 (D. Mass. filed Apr. 29, 2019). The district court granted a preliminary injunction, finding that plaintiffs were likely to succeed on the merits of their APA claim that ICE's actions were contrary to the INA, which must be interpreted to be constrained by a common law privilege against civil arrest in courthouses. *Id.*, ECF No. 51, Mem. & Order (D. Mass. June 20, 2019). Defendants appealed, and the First Circuit vacated the preliminary injunction order. *Ryan v. U.S. Immigr. & Customs*

*Enf't*, 974 F.3d 9, 17, 34 (1st Cir. 2020). In so doing, the First Circuit concluded that the plaintiffs were "unlikely to succeed in demonstrating a long-established and familiar common law rule barring courthouse arrests that can be presumed to have been incorporated into the INA's civil arrest authority." *Id.* at 28. Neither the district court nor the First Circuit reached the other claims raised in the complaint.

51. Other state plaintiffs also sued to challenge the 2018 Directive, with courts finding that the plaintiffs had a legal basis under the APA and Tenth Amendment for proceeding with their claims. *See, e.g.*, *New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 389–94 (SDNY 2019) (denying a motion to dismiss and finding that the common law privilege against civil arrests applies to immigration arrests, in and around courthouses); *Washington v. U.S. Dep't of Homeland Security*, 614 F. Supp. 3d 863, 878–83 (W.D. Wash. 2020) (denying a motion to dismiss and finding that plaintiffs had pleaded plausible claims under the APA for arbitrary and capricious agency action and the Tenth Amendment).

**B. 2021 Directive.**

52. On or about April 27, 2021, under a new federal administration, ICE and U.S. Customs and Border Protection ("CBP") issued a new directive regarding civil immigration arrests in state courthouses. A copy of that directive ("2021 Directive") is attached as Exhibit C and incorporated herein.

53. The 2021 Directive superseded and revoked the 2018 Directive. Ex. C at 1.

54. The 2021 Directive limited immigration arrests in courthouses as follows:

> A civil immigration enforcement action may be taken in or near a courthouse if (1) it involves a national security threat, or (2) there is an imminent risk of death, violence, or physical harm to any person, or (3) it involves hot pursuit of an individual who poses a threat to public safety, or (4) there is an imminent risk of destruction of evidence material to a criminal case.

> In the absence of hot pursuit, a civil immigration enforcement action also may be taken in or near a courthouse against an individual who poses a threat to public safety if: (1) it is necessary to take the action in or near the courthouse because a safe alternative location for such action does not exist or would be too difficult to achieve the enforcement action at such a location, and (2) the action has been approved in advance by a Field Office Director, Special Agent in Charge, Chief Patrol Agent, or Port Director.
>
> A "safe alternative location for such action" means one that is safe for DHS personnel, the subject of the enforcement action, and the public.
>
> To the fullest extent possible, an enforcement action in the courthouse will be taken in a nonpublic area of the courthouse, outside of public view, be conducted in collaboration with courthouse security personnel, utilize the courthouse's non-public entrances and exits, and be conducted at the conclusion of the judicial proceeding that brought the individual to the courthouse.

Ex. C at 2–3.

55. The 2021 Directive articulated the following "[c]ore [p]rinciple":

> The courthouse is a place where the law is interpreted, applied, and justice is to be done. As law enforcement officers and public servants, we have a special responsibility to ensure that access to the courthouse—and therefore access to justice, safety for crime victims, and equal protection under the law—is preserved.

Ex. C at 1.

56. The 2021 Directive also recognized that "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses" and accordingly "impair the fair administration of justice." Ex. C at 1.

57. Following the issuance of the 2021 Directive, plaintiffs in the *Ryan* matter voluntarily dismissed their claims challenging the 2018 Directive. *Ryan v. U.S. Immigr. & Customs Enf't*, No. 1:19-cv-11003, ECF No. 115, Notice of Voluntary Dismissal (D. Mass. May 21, 2021).

**C. January 2025 Directive.**

58. On or about January 21, 2025, under the current federal administration, ICE issued a new directive on courthouse arrests, Policy Number 11072.3, "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses." A copy of that directive ("January 2025 Directive") is attached as Exhibit D and incorporated herein.

59. The January 2025 Directive rescinded and superseded the 2021 Directive. Ex. D at 1.

60. The January 2025 Directive asserted that courthouse arrests "are often required when jurisdictions refuse to cooperate with ICE, including when such jurisdictions refuse to honor immigration detainers[.]" Ex. D at 1.

61. Massachusetts was and is a jurisdiction where the law limits cooperation with ICE. For example, Massachusetts law does not authorize Massachusetts law enforcement officers "to arrest and hold an individual solely on the basis of a Federal civil immigration detainer, beyond the time that the individual would otherwise be entitled to be released from State custody." *Lunn v. Commonwealth*, 477 Mass. 517, 536–37 (2017).

62. The January 2025 Directive removed restrictions on civil immigration arrests in courthouses, as compared to the 2021 Directive. The January 2025 Directive stated that "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location . . . ." Ex. D at 2.

63. The January 2025 Directive also specified that federal agents could target one person for arrest, and then also arrest "[o]ther aliens" encountered during the enforcement action at the courthouse, including "family members or friends accompanying the target . . . to court

appearances or serving as a witness in a proceeding," based on the "totality of the circumstances." Ex. D at 2.

64. The January 2025 Directive did include at least one significant limitation on courthouse arrests: "civil immigration enforcement actions in or near courthouses" are permitted only "where such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take place." Ex. D at 2. The January 2025 Directive stated that ICE officers or agents "must coordinate with the relevant local Office of the Principal Legal Advisor (OPLA) office before conducting enforcement actions in or near courthouses to determine whether jurisdiction-specific legal limitations apply." *Id.*[4]

**D. May 2025 Directive.**

65. On or about May 27, 2025, ICE issued a new directive on courthouse arrests, Policy Number 11072.4, "Civil Immigration Enforcement Actions in or near Courthouses." Ex. A.

66. The May 2025 Directive superseded the January 2025 Directive. Ex. A at 1.

67. The May 2025 Directive is substantially similar to the January 2025 Directive, with the exception that the May 2025 Directive removes the requirement that civil enforcement actions in or near courthouses can occur only where such actions are not precluded by the laws of the local jurisdiction. *See supra* ¶ 64.

68. The United States has publicly filed the administrative record for the May 2025 Directive in at least two lawsuits challenging the May 2025 Directive. *African Communities*

[4] OPLA, within DHS, provides legal services to ICE programs and offices, legal advice and counsel to ICE personnel on immigration law enforcement authorities. https://www.ice.gov/opla.

*Together v. Venturella*, No. 1:25-cv-06366, ECF No. 64 (SDNY Nov. 4, 2025); *Pablo Sequen v. Albarran*, No. 5:25-cv-06487, ECF No. 146 (N.D. Cal. Dec. 19, 2025).

69. Defendants did not provide reasons for the removal of the provision regarding the laws of the local jurisdiction from the May 2025 Directive.

70. Currently, ICE makes statements on its webpage describing its enforcement and removal operations for protected areas and courthouse arrests—last updated in February 2026—but makes no mention of the May 2025 Directive. The statement indicates that ICE is following the January 2025 Directive, including its mandate that courthouse arrests can only occur "where such action is not precluded by laws imposed by the jurisdiction in which the civil immigration enforcement action will take place."[5] A copy of that statement is attached as Exhibit E and incorporated herein.

**E. Vacatur of the January 2025 and May 2025 Directives.**

71. In 2025, plaintiffs brought habeas petitions and a putative class action in the Northern District of California challenging, inter alia, ICE's practice of arresting them at immigration courthouses. *Pablo Sequen v. Albarran*, 835 F. Supp. 3d 1061, 1114–15, 1131 (N.D. Cal. 2026).

72. On June 23, 2026, the district court in *Pablo Sequen* certified two classes of plaintiffs, and found that the January 2025 and May 2025 Directives were arbitrary and capricious in violation of the Administrative Procedure Act and vacated the policies in full. *Id.* The court entered judgment on June 30, 2026, after the plaintiff class sought enforcement of the court's June 23, 2026 order. *Pablo Sequen*, No. 5:25-cv-06487, Order re: Stipulation for Entry of

[5] U.S. Immigr. & Customs Enf't, *Protected Areas and Courthouse Arrests*, https://perma.cc/J4FP-J655 (last visited Nov. 21, 2026).

Judgment; And Judgment Under Rule 54(b), ECF No. 212 (N.D. Cal. June 30, 2026). On July 10, 2026, the district court denied defendants' request for a stay pending appeal. *Id.*, Order Denying Motion to Stay Pending Appeal, ECF No. 217 (N.D. Cal. July 10, 2026).

73. Defendants in *Pablo Sequen* then filed an appeal and requested a stay from the U.S. Court of Appeals for the Ninth Circuit. Motion to Stay Lower Court or Agency Proceedings/Order/Judgment, *Garcia v. Kaiser*, No. 26-4310, ECF No. 8 (9th Cir. July 14, 2026).[6]

## IV. Massachusetts's Restrictions on Courthouse Arrests.

74. The ability to control a courthouse is an historic power of the state, and that power includes the right to restrict arrests in the courthouse.

75. The Commonwealth has exercised that power in part through legislation. In order to "ensure the right of access to and protection in courts of justice," Massachusetts places restrictions on civil arrests in state courthouses. *See* St. 2026, ch. 163. Those restrictions are reflected in and implemented by the policies of the Massachusetts Trial Court.

### A. The PROTECT Act.

76. An act promoting rule of law, oversight, trust, and equal constitutional treatment ("PROTECT Act") was enacted by the Massachusetts Legislature and signed into law by Governor Maura Healey on August 5, 2026. *See* St. 2026, ch. 163.

77. The PROTECT Act, among other things, added Chapter 221D to the Massachusetts General Laws.

[6] As of the filing of this Complaint, both the appeal and the motion for a stay remain pending before the Ninth Circuit.

78. Section 2 of Chapter 221D, which became effective on November 3, 2026, establishes certain limitations on and procedural requirements for civil arrests at Massachusetts courthouses made by a "law enforcement officer or other employee or representative of a law enforcement agency." Mass. Gen. L. ch. 221D, § 2(a).

79. Section 2 of Chapter 221D does not limit criminal arrests in any way and defines "civil arrests" to exclude arrests for criminal prosecution. Mass. Gen. L. ch. 221D, § 1.

80. To make a civil arrest in compliance with the statute, officers, employees, or representatives of a law enforcement agency must be (i) "acting in their official capacity" and (ii) have "provided documentation to a designated judge, justice or judicial magistrate sitting in the courthouse demonstrating that the individual to be arrested is the subject of a judicial warrant or judicial order authorizing civil arrest." Mass. Gen. L. ch. 221D, § 2(a).

81. These procedural requirements apply to civil arrests made in "the interior of any facility in which a court of the commonwealth conducts business, or curtilage thereof" including, but not limited to, "lawns, plazas, courtyards, steps, ramps, sidewalks, walkways, any garage, driveway or parking lot owned by or leased by the judicial branch contiguous to a courthouse." Mass. Gen. L. ch. 221D, § 1.

82. The statute prohibits making any civil arrest in state courtrooms. Mass. Gen. L. ch. 221D, § 2(b).

83. "Nothing in [Chapter 221D] shall be construed to narrow or abrogate rights or privileges against civil arrest that exist under the common law." Mass. Gen. L. ch. 221D, § 6.

84. Although Massachusetts did not have a statute restricting courthouse arrests until September 2026, other states had such laws and policies in place. *E.g.*, Cal. Civil Code

§ 43.54(a) (enacted in October 2019); N.Y. Laws of 2020, ch. 322 (Protect Our Courts Act) (enacted in December 2020).

**B. Trial Court Policy.**

85. On September 2, 2026, after Massachusetts enacted the PROTECT Act, the Massachusetts Trial Court adopted a policy on interactions with United States Immigration and Customs Enforcement (the "Trial Court Policy").[7] A copy is attached as Exhibit F and incorporated herein.

86. Certain sections of the Trial Court Policy went into effect on November 3, 2026, the same day as Section 2 of Chapter 221D, the courthouse arrest provisions of the Act.

87. The Trial Court Policy requires all Trial Court employees to comply with the Act. It also provides that "Trial Court employees shall not under any circumstances interfere with or assist the actions of federal immigration authorities engaged in civil immigration enforcement." Ex. F, pt. I.

88. The Trial Court Policy requires that, for a civil arrest in a state courthouse, law enforcement officers intending to make the arrest must provide the judicial warrant for the arrest to a judge sitting in the courthouse. Ex. F, pt. II. The Trial Court Policy provides that documents signed by an immigration judge or other ICE personnel are not sufficient to effectuate a civil arrest in a courthouse. *Id.*

[7] Mass. Trial Court, *Massachusetts Trial Court Policy on Interactions with United States Immigration and Customs Enforcement* (Sept. 2, 2026), https://www.mass.gov/policy-statement/massachusetts-trial-court-policy-on-interactions-with-united-states-immigration-and-customs-enforcement.

**V. ICE Arrests in Massachusetts State Courthouses.**

89. Immigration arrests in Massachusetts state courthouses increased dramatically after the adoption of the January 2025 Directive.[8] In 2025, ICE agents arrested over 600 people in Massachusetts state courthouses.[9] In the first ten months of 2026, ICE agents arrested over 500 people in Massachusetts state courthouses at a pace to exceed their number of Massachusetts state courthouse arrests from 2025.

90. Since June 30, 2026, when judgment entered in *Pablo Sequen* vacating the January 2025 and May 2025 Directives, ICE has continued to make civil arrests in Massachusetts courthouses at a similar rate as before the vacatur. Defendants have identified no other directive that authorizes this conduct—yet the practice continues nearly every day in Massachusetts.

91. ICE made 60 arrests in Massachusetts state courthouses in July 2026, 41 in August 2026, 52 in September 2026, and 45 in October 2026.

92. Since November 3, 2026, when Chapter 221D of the Massachusetts General Laws went into effect, ICE has continued to make civil arrests in Massachusetts courthouses.

93. ICE's arrests in Massachusetts state courthouses on and after November 3, 2026, are in knowing disregard of the PROTECT Act and the Trial Court Policy.

94. On October 19, 2026, after Massachusetts enacted the PROTECT Act, Defendant Sher derided the Act as "embarrassingly performative legislation" and stated that ICE's ERO

---

[8] Simón Rios & Rachell Sanchez-Smith, *ICE agents are staking out local courthouses. As they've roamed the halls, Mass. court arrests tripled*, WBUR (Dec. 16, 2025), https://www.wbur.org/news/2025/12/16/ice-courthouses-arrest-massachusetts.

[9] Sarah Betencourt, *There were over 600 ICE arrests in Mass. courthouses last year. Here's where they occurred*, WGBH (Mar. 17, 2026), https://www.wgbh.org/news/local/2026-03-17/there-were-over-600-ice-arrests-in-mass-courthouses-last-year-heres-where-they-occurred.

field office in Boston "will continue to proudly protect Massachusetts communities from these dangerous criminals."[10]

95. On or around November 13, 2026, ICE stated to a media source that the "Supremacy Clause makes clear that sanctuary politicians do not control federal law enforcement."[11]

96. From November 3, 2026, through November 20, 2026, ICE made civil arrests of 38 individuals in Massachusetts courthouses without a judicial warrant.

97. Between November 3 and November 6, 2026, ICE made civil arrests of nine individuals at Massachusetts state courthouses.

98. Between November 9 and November 13, 2026, ICE made civil arrests of 14 individuals at Massachusetts state courthouses.

99. Between November 16 and November 20, 2026, ICE made civil arrests of 15 individuals at Massachusetts state courthouses.

100. On information and belief, none of the civil arrests made by federal agents at Massachusetts courthouses between November 3 and November 20 were made with judicial warrants or by presenting a judicial warrant to a designated judge, justice, or judicial magistrate sitting in the courthouse, as required by Mass. Gen. L. ch. 221D, § 2 and Trial Court Policy.

101. The arrests made by federal agents at state courthouses significantly disrupted ongoing state judicial proceedings. For example, on November 3, 2026, at the state courthouse in Medford, which contains the Cambridge District Court and the Malden District Court, ICE

---

[10] Press Release, U.S. Immigr. & Customs Enf't, *ICE Boston Arrests 82 Illegal Aliens During 3-Day Operation in Massachusetts* (Oct. 19, 2026), https://perma.cc/SFN8-6JJK.

[11] Irene Rotondo, *ICE arrests at Mass. Courthouses continue despite PROTECT Act going into effect*, MassLive (Nov. 13, 2026), https://www.masslive.com/news/2026/11/ice-arrests-at-mass-courthouses-continue-despite-protect-act-going-into-effect.html.

arrested two individuals. One of those individuals was scheduled to appear as a defendant in a bench trial on charges of assault and battery on a family member and assault and battery with a dangerous weapon. ICE arrested him in the courthouse or its curtilage and, as a result, a default was entered in the criminal proceeding based on his failure to appear. During ICE's enforcement actions in the Medford courthouse that day, ICE agents also broke one of the courthouse's security turnstiles. That arrest, as well as additional information on courthouse arrests in Middlesex County, is described in a declaration from Middlesex District Attorney Marian Ryan, attached as Exhibit G and incorporated herein.

## VI. Defendants Contravene the Tenth Amendment by Interfering with the Commonwealth's Judicial and Police Powers.

102. Defendants' actions violate Massachusetts's sovereign authority, protected under the Tenth Amendment, to control and maintain its state judicial system and enforce its civil and criminal laws.

103. The Constitution reserves to the States, or to the people, all rights and powers "not delegated to the United States." U.S. Const. amend. X.

104. The Constitution delegated to the federal government "few and defined" powers, while "[t]he powers reserved to the several States . . . extend[ed] to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (quoting The Federalist No. 45, at 292–93 (C. Rossiter ed. 1961)).

105. The federal government may neither intrude upon traditional areas of state authority, *see Bond v. United States*, 564 U.S. 211, 225 (2011), nor commandeer state officials to carry out federal policies, *see Printz v. United States*, 521 U.S. 898, 932 (1997).

106. "One of the reserved powers was the maintenance of state judicial systems for the decision of legal controversies." *Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970). The integrity and independence of state court systems have been central to American government since the ratification of the Constitution. *See United States v. New York*, 810 F. Supp. 3d 329, 348 (NDNY 2025) ("Settled federalism principles and the Tenth Amendment generally empower the States to control the use of their own facilities, manage their internal affairs, and direct the control of their officials without federal interference.").

107. The States also retain primary authority to enact and enforce criminal laws within their borders. *U.S. v. Morrison*, 529 U.S. 598, 618 (2000) (there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims"); *see also U.S. v. Lopez*, 514 U.S. 549, 567 (1997).

108. By conducting civil immigration arrests in Massachusetts courthouses, flouting both Massachusetts state law and the policies of the Massachusetts Trial Court, Defendants violate Massachusetts's sovereign authority to administer justice and operate a court system that is accessible to all the Commonwealth's residents.

109. Defendants' implementation of the May 2025 Directive has undermined the Commonwealth's ability to prosecute crimes. When ICE arrests defendants on courthouse property in the midst of a criminal case, it undermines the prosecutor's ability to hold the defendants accountable for their alleged criminal conduct, deprives victims of the opportunity to be heard, and jeopardizes the defendant's right to a fair trial. Ex. G, ¶ 7 (Ryan Decl.).

110. Fear of being subjected to civil immigration arrests at the courthouse may also make defendants, victims, and witnesses less likely to appear in court when summonsed for criminal cases, which impacts public safety.

111. On information and belief, Defendants' courthouse arrests in Massachusetts have made some victims and witnesses afraid to cooperate in state civil and criminal proceedings because of a fear of being apprehended or harassed by ICE.[12] *See* Ex. G, ¶ 7 (Ryan Decl.); Declaration of Adrianne Ventura (attached hereto as Exhibit I and incorporated herein), ¶ 7; Declaration of Lorrayne Alves (attached hereto as Exhibit J and incorporated herein), ¶ 7. As a result, Defendants' actions have an adverse effect on Massachusetts's ability to resolve civil and criminal disputes and to enhance public safety for victims and witnesses of crime.[13]

112. On information and belief, workers who have experienced workplace violations have chosen not to seek legal remedy because the workers feared ICE's presence at local courthouses. *See* Ex. I, ¶ 7 (Ventura Decl.). For example, workers who had not been paid for work they had completed decided not to pursue a complaint.

113. In another case, on information and belief, a family was threatened with eviction merely for cooking and turning on the heat in their apartment, but they declined legal assistance for fear of ICE's presence at the state courthouse.

114. On information and belief, tenants defending against eviction have declined to attend required court appearances out of fear of ICE's presence at state courthouses, placing them at risk of eviction without an opportunity to present their case. *See* Ex. J, ¶¶ 7-8 (Alves Decl.).

[12] *See, e.g.*, Betencourt, *supra* note 9.

[13] Rios & Sanchez-Smith, *supra* note 8.

115. For example, on information and belief, a tenant had initiated a case in which he sought to avoid eviction, but the case was dismissed on November 10 because fear of ICE's presence in Marlborough District Court caused the tenant to miss a court appearance. This fear was credible. As noted above, on information and belief, ICE made two arrests in the Marlborough District Court on November 9.

116. On another occasion, on information and belief, a tenant who was the sole provider for his children did not attend a hearing at housing court after seeing news reports of ICE conducting civil arrests at courthouses. As a result, judgment entered in favor of his landlord without the tenant having presented his case, placing him and his children at risk of eviction. *See* Ex. J, ¶ 8 (Alves Decl.).

117. Some survivors of domestic violence in Massachusetts's immigrant communities have faced a stark choice: stay with the partner who poses a physical threat or seek a restraining order at a courthouse where immigration officers could be waiting.[14] *See* Ex. I, ¶ 7 (Ventura Decl.).

118. In one instance, on information and belief, a woman refused to report a violent rape, fearing that ICE would arrest her if she went to a state courthouse to testify against the individual who raped her.

119. In another instance, on information and belief, one woman has missed multiple court dates at which she could have testified against her partner, who had threatened her with a knife, because she feared ICE's presence in the courthouse. The woman is also unwilling to seek

[14] Irene Rotondo, *Fear of ICE keeps immigrant survivors of domestic violence out of Massachusetts courts*, MassLive (Apr. 24, 2026), https://www.masslive.com/boston/2026/04/fear-of-ice-keeps-immigrant-survivors-of-domestic-violence-out-of-massachusetts-courts.html.

a restraining order against her abuser because she is afraid that ICE will arrest her at a state courthouse.

120. On information and belief, another woman refused to take a case against her abuser to trial and attend the proceedings because she was afraid of ICE's presence in the courthouses.

121. In another case, on information and belief, a woman refused to attend a hearing at a state courthouse to extend a restraining order against her abuser, due to ICE's presence in the courthouse.

122. Defendants' actions also expose the state to the risk of disruption and damage to its property.

123. For example, on November 3, 2026, as described above, federal agents damaged security barriers while pursuing an individual through the entrance to the Malden and Cambridge District Court in Medford.

124. The courthouse arrests in Massachusetts have also had impacts on criminal defense representation provided by the Commonwealth. Criminal defendants in Massachusetts have access to representation by state employees through CPCS, a state agency. Mass. Gen. L. ch. 211D, § 1. The Immigration Impact Unit ("IIU") is a division within CPCS that provides expert support to defense attorneys when they have noncitizen clients whose cases may implicate immigration law. For example, when a defense attorney is aware their client has been arrested by ICE during the pendency of a criminal matter, they may reach out to the IIU for advice on how to effectively represent their client during ICE detention.

125. Due to the Defendants' actions, the IIU regularly receives requests from defense attorneys for assistance after an ICE courthouse arrest. This is a burden on the IIU, defense

attorneys, and strategic litigation units, who must devote significant time and resources researching and developing arguments to preserve their clients' rights and provide zealous defense. Time spent navigating complications arising from ICE arrests and detention likewise impacts the resources available for other criminal matters on behalf of other indigent clients in Massachusetts. Such resource constraints interfere with the providing expeditious criminal proceedings and dispositions to Massachusetts residents.

126. The additional costs caused by ICE courthouse arrests and incurred by CPCS, as well as additional information on courthouse arrests in Massachusetts, are described in a declaration from Jennifer Klein, Director of CPCS's IIU. That declaration is attached as Exhibit H and incorporated herein.

127. These ongoing threats to criminal and civil proceedings, state property and access to justice will continue without judicial relief.

## VII. Defendants Contravene the Tenth Amendment by Commandeering State Resources to Facilitate Federal Immigration Enforcement and by Requiring State Officials to Ignore Violations of State Law and Policy.

128. Defendants' actions also contravene the Tenth Amendment's prohibition against federal commandeering of state resources to assist in federal enforcement actions.

129. "[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs," including those that conscript state law enforcement officers, judges, or legislators to assist in the implementation of a federal law enforcement or policy scheme. *Printz*, 521 U.S. at 925; *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 475–77 (2018).

130. On information and belief, ICE agents bring weapons and physical restraints into state courthouses for the purpose of conducting civil arrests without judicial warrants, in

violation of state law. They conduct these actions in state courthouses intentionally, exploiting the resources provided by and to state courthouses in order to advance federal policy goals.

131. Multiple federal courts have described ICE's 2018 and 2025 courthouse arrest policies as violations of the Tenth Amendment's anticommandeering protections because they use state resources to further federal policy ends and because they coerce state employees regarding enforcement of courthouse policy. *See United States v. New York*, 810 F. Supp. 3d at 355 ("Compelling New York to allow federal immigration authorities to reap the benefits of the work of state employees [in conducting security screenings of courthouse visitors] is no different than permitting the federal government to commandeer state officials directly in furtherance of federal objectives."); *State v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 394 (SDNY 2019) ("ICE's policy has commandeered state and local judges and court officials *not* to take action in response to ICE's arrests, even when the federal agency causes great disruption to the functioning of the state judiciary and the state agents would therefore normally intervene.") (emphasis original).

132. It is "not easy to imagine" "[a] more direct affront to state sovereignty," *Murphy*, 584 U.S. at 474, than Defendants' policy of using state resources to facilitate immigration arrests without state consent. There can be little doubt that the federal government could not command state district attorneys, public defenders, and judges to hand over individuals to ICE for arrest. *See id.* at 473 ("The Federal Government may not command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." (internal citations omitted)). Defendants attempt to accomplish by force what they could not command by using the Commonwealth—including its employees, security resources, and summoning power—for Defendants' own policy objectives.

133. Defendants rely on the Commonwealth's ability to compel appearances, combined with information generated and maintained by state employees using state resources, including court calendars and schedules of proceedings, to identify and locate individuals for civil immigration arrests at Massachusetts courthouses.

134. Defendants admitted the utility and manipulation of state courthouse resources in their May 2025 Directive: "Federal, state, and local law enforcement agencies routinely engage in enforcement activities in or near courthouses because many individuals appear in courthouses for unrelated criminal or civil violations." Ex. A at 1.

135. Defendants reiterated this utility and intended manipulation on or about November 17, 2026, when ICE stated that making arrests at courthouses "conserves valuable law enforcement resources because they already know where a target will be."[15]

136. When armed federal agents walk the hallways of the public courthouse, waiting to arrest individuals without judicial warrants, the Commonwealth's very act of summoning an individual to the courthouse for a proceeding turns the court system into an unwilling facilitator of federal immigration enforcement.

137. The Commonwealth's work of conducting security screenings on people when they enter state courthouses is another one of the reasons that Defendants conduct civil arrests in state courthouses.

138. Defendants admitted to the intentional use of this state resource in their May 2025 Directive: "Individuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband. Accordingly, when ICE engages in civil

---

[15] Louisa Moller, *ICE arrests continue at sensitive locations in Massachusetts despite PROTECT Act*, CBS News (Nov. 17, 2026), https://www.cbsnews.com/boston/news/ice-arrests-continue-massachusetts-protect-act/?intcid=CNR-02-0623&utm.

immigration enforcement actions in or near courthouses it can reduce safety risks to the public, targeted alien(s), and ICE officers and agents." Ex. A at 1.

139. Defendants reiterated this intention on or about November 17, 2026, when ICE stated that making arrests in courthouses is "common sense," because "[t]hese illegal aliens have gone through security and been screened to not have any weapons."[16]

140. Compelling Massachusetts to allow federal immigration authorities to reap the benefits of the work of state employees is no different than permitting the federal government to commandeer state officials directly in furtherance of federal objectives.

141. By continuing to engage in courthouse arrests without judicial warrants, Defendants have also taken coercive steps towards the Commonwealth by forcing state courthouse employees to choose between (a) confronting ICE officers as to their violations of state law and Trial Court policy, which may itself cause disruptions to state courthouses, and (b) permitting these ongoing violations of state law and Trial Court policy, which likewise has harmful effects on the administration of justice.

142. The coercive nature of this choice is reflected in the May 2025 Directive itself. Defendants indicated that their courthouse arrests policy was motivated in part by States' decisions to have policies against cooperation with federal immigration authorities, and by Defendants' desire to leverage state resources to advance federal immigration enforcement notwithstanding those policy decisions. The May 2025 Directive states: "[E]nforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE, including when such jurisdictions refuse to honor immigration detainers and transfer aliens directly to ICE custody." Ex. A at 1. Further, Defendants' assertion in its May 2025 Directive

[16] *Id.*

that civil arrests in state courthouses are necessitated by a lack of voluntary state cooperation with immigration enforcement demonstrates an intent to commandeer state resources and law for federal immigration enforcement.

143. As a result, the May 2025 Directive and its implementation constitutes a commandeering of state power and resources, either directly or through coercion. Ex. A at 1.

## CAUSES OF ACTION

### Count I—Against All Defendants
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Arbitrary and Capricious Acts

144. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

145. Defendants are agencies under the APA. 5 U.S.C. § 551(1).

146. The May 2025 Directive is a "final agency action" under the APA.

147. Although a federal court vacated the May 2025 Directive on June 30, 2026, Defendants' courthouse enforcement actions in Massachusetts have not materially changed since that date. Therefore, on information and belief, Defendants in Massachusetts are still implementing the May 2025 Directive despite the vacatur.

148. The May 2025 Directive is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

149. The May 2025 Directive is arbitrary and capricious because ICE has failed to adequately explain its departure from its own requirement, as stated in the January 2025 Directive and ICE's current website, that courthouse arrests are permissible only if not precluded by laws imposed by the jurisdiction in which the enforcement action will take place—a change that occurred without consideration of serious reliance interests on the prior policies that must be

taken into account, and without the more detailed justification required for such a change in position.

150. The May 2025 Directive is arbitrary and capricious because Defendants failed to engage in reasoned decision-making and failed to articulate a satisfactory explanation for their action.

151. The May 2025 Directive is arbitrary and capricious because Defendants considered inappropriate factors in making their decision and relied on factors that are not supported by substantial evidence.

152. The May 2025 Directive is arbitrary and capricious because Defendants failed to consider important aspects of performing arrests in and near courthouses.

153. The May 2025 Directive has predictably resulted in negative consequences to the public and to Plaintiff, including, but not limited to, impairing the Commonwealth's ability to operate its judicial system, to ensure access to justice, to prosecute violations of state criminal law, and to vindicate the rights of Massachusetts and its people.

154. The May 2025 Directive is arbitrary and capricious because Defendants failed to acknowledge or provide a reasoned explanation for departures from past agency actions, failed to consider the harms that would result from their actions, and also failed to consider reliance interests as they pertain to the Commonwealth's maintenance and operation of a judicial system and enforcement of its own laws.

155. Accordingly, Plaintiff is entitled to an order and judgment holding unlawful, vacating, and setting aside the May 2025 Directive and enjoining any action taken to enforce or implement the Directive, and further enjoining ICE from making civil arrests in Massachusetts state courthouses in violation of the PROTECT Act pursuant to any reinstated directive.

**<u>Count II—Against All Defendants</u>**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(C):**
**Acts in Excess of Statutory Authority**

156. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

157. The May 2025 Directive is in excess of statutory authority in violation of 5 U.S.C. § 706(2)(C).

158. The text of the INA confers broad authority upon ICE to conduct civil arrests when certain criteria are met. 8 U.S.C. §§ 1226(a), 1357(a)(2). The provisions do not expressly permit or prohibit civil arrests in courthouses.

159. As a result, the INA should be construed to prohibit such arrests if: (a) pursuant to the nonderogation canon, there was a historic common law against the arrests when the INA was enacted; or (b) pursuant to the federalism canon, the arrests interfere with historic powers of the States.

160. The ability to control a courthouse is a historic power of the state, and that power includes the right to restrict arrests in the courthouse.

161. The INA does not include a clear intent to interfere with that power. The May 2025 Directive to make civil arrests in state courthouses, interfering with the historic power of Massachusetts to enact laws restricting arrests in state courthouses, is therefore in excess of statutory authority.

162. Accordingly, Plaintiff is entitled to an order and judgment, holding unlawful, vacating, and setting aside the May 2025 Directive, and enjoining any action taken to enforce or implement the Directive, and further enjoining ICE from making civil arrests in Massachusetts state courthouses in violation of Massachusetts law and the policy of its courts pursuant to any reinstated directive.

**Count III—Against All Defendants**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**Contrary to Constitutional Right, Power, Privilege or Immunity: Tenth Amendment**

163. Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

164. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend. X.

165. The States' judicial and police powers are powers that the Constitution reserves to the States under the Tenth Amendment. *See*, *e.g.*, *Younger v. Harris*, 401 U.S. 37, 43 (1971). Likewise, "each State's power to prosecute is derived from its own 'inherent sovereignty,' not from the Federal Government." *Heath v. Alabama*, 474 U.S. 82, 89 (1985).

166. The May 2025 Directive and Defendants' implementation of the Directive, in disregard of state law, interfere with the State's execution of its core sovereign judicial and police functions by infringing on the State's ability to maintain and operate a judicial system, prosecute crimes, and carry out related police powers.

167. The May 2025 Directive violates the Tenth Amendment, and is contrary to the constitutional right, power, and privilege of the State in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(C).

168. Accordingly, Plaintiff is entitled to an order and judgment, holding unlawful, vacating, and setting aside the May 2025 Directive, and enjoining any action taken to enforce or implement the Directive, and further enjoining ICE from making civil arrests in Massachusetts state courthouses in violation of Massachusetts law and the policy of its courts, pursuant to any reinstated directive.

**Count IV—Against All Defendants**
**U.S. Constitution, Tenth Amendment**

169. Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

170. Defendants' May 2025 Directive and their immigration enforcement actions excessively interfere with Massachusetts' sovereignty, in violation of the Tenth Amendment, because Defendants are violating Massachusetts's sovereign authority to administer justice and operate a court system and because Defendants are violating the anticommandeering doctrine.

171. Defendants have impeded Plaintiff's ability to perform core sovereign functions, including providing a judicial system, enforcing the State's own laws, maintaining public safety, and pursuing criminal prosecutions. The May 2025 Directive and Defendants' practice under the Directive of carrying out immigration enforcement against parties, witnesses, and others attending Massachusetts courts unduly interfere with Massachusetts' administration of justice in Massachusetts state courts. Defendants' enforcement activities deter criminal defendants from appearing and also deter witnesses, would-be litigants and claimants, and others from bringing violations of state law to the attention of law enforcement authorities and the courts. Defendants further interfere with Massachusetts's sovereign right to manage its judicial system by damaging courthouse facilities in the course of making civil arrests.

172. Defendants' enforcement activities also "excessively interfere" with Massachusetts's sovereign rights by using state officials to facilitate federal immigration policies. *See Printz*, 521 U.S. at 932. The very act of summoning an individual to a state court for a hearing turns the court system into a facilitator of the federal immigration enforcement agenda. Defendants continue to use state resources despite clearly lacking consent, unconstitutionally commandeering state officials. Defendants' actions violate the Tenth

Amendment regardless of motive, but here they have been undertaken, in part, to punish and attempt to coerce Massachusetts to devote their own resources to carrying out federal immigration enforcement at the request and direction of the U.S. government.

173. Plaintiff is entitled to a declaration that Defendants have impermissibly and excessively infringed on Plaintiff's sovereign powers, in violation of the Tenth Amendment, and an order enjoining Defendants from further unconstitutional conduct, including civil arrests in Massachusetts state courthouses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff the Commonwealth of Massachusetts respectfully requests that this Court enter judgment in its favor and grant the following relief:

I. Declare that the May 2025 Directive violates the Administrative Procedure Act, as set forth above;

II. Declare that Defendants' actions are in violation of the Tenth Amendment to the United States Constitution;

III. Stay, vacate, and set aside the May 2025 Directive;

IV. Enjoin Defendants from reissuing, adopting, implementing, giving effect to, or enforcing the May 2025 Directive, or any substantially similar directive issued under a different name;

V. Enjoin Defendants from conducting civil immigration arrests at Massachusetts state courts, unless such arrests are permitted by Massachusetts state law;

VI. Award Plaintiff reasonable attorneys' fees and costs; and

VII. Grant Plaintiff any other relief that the Court may deem just and proper.

November 23, 2026

Respectfully submitted.

**ANDREA JOY CAMPBELL**
*Attorney General of Massachusetts*

/s/ Andrew Batchelor
Andrew Batchelor (BBO #673248)
*State Trial Counsel*
Katherine Dirks (BBO #673674)
*Chief State Trial Counsel*
Hailey D'Ambrosio (BBO #707331)
Jak Kundl (BBO #713951)
*Assistant Attorneys General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
andrew.batchelor@mass.gov
katherine.dirks@mass.gov
hailey.dambrosio@mass.gov
jak.kundl@mass.gov

*Counsel for the*
*Commonwealth of Massachusetts*